UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

IN THE MATTERS OF THE       )
SEARCH OF ROOM 602          )    No 1:21-mj- 70
THE WESTIN HOTEL            )
801 PINE STREET,            )
CHATTANOOGA, TN             )

## AFFIDAVIT

I, Justin Headden, having been first duly sworn, depose and states as follows:

1) This affidavit is submitted in support of a search warrant for the premises described as Room 602 of the Westin Hotel, 801 Pine Street, Chattanooga, Tennessee.

2) I am an officer with the Chattanooga Police Department assigned to the Drug Enforcement Administration ("DEA"), United States Department of Justice as a Task Force Officer. As such, I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and empowered by law to conduct investigations of, among other things, offenses enumerated in Title 21, United States Code, Section 846. I have been employed as a TFO with DEA for approximately 1 year. I have been employed as a narcotics, gang, and firearms investigator for Chattanooga Police Department for the past 9 years. In connection with my official CPD/DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking for the past 9

years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including numerous specialized narcotics investigation schools.

3) Based upon your affiant's training, experience, and participation in investigations involving the distribution of narcotics, your affiant knows:

a) That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

b) That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

c) That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

d) That large-scale narcotics traffickers must maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

e) That narcotics traffickers frequently maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances and chemicals. That narcotics traffickers commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

f) That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and/or their businesses for their ready access and to conceal from law enforcement authorities;

g) That, in order to accomplish this concealment, narcotics traffickers

frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

      h)     That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over.

      i)     That large-scale traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the information described in items a, c, d, e and g above.

      j)     That when drug traffickers amass large proceeds from the sale of drugs and/or chemicals that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

      k)     That the sale of controlled substances generates large quantities of United

States currency in small denominations (commonly referred to as "street money");

l) That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers.

m) That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

n) That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

o) That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p) That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent

during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q) That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r) That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession.

s) That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t) That drug traffickers commonly have in their possession, which is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency.

u) That drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

Page 5 of 13

Case 1:21-mj-00070-CHS   Document 2   Filed 04/26/21   Page 5 of 16   PageID #: 9

## FACTS ESTABLISHING PROBABLE CAUSE

4) The facts in this affidavit do not set forth all my knowledge of this matter. It merely consists of facts necessary to establish probable cause for the warrant requested herein. I have relied on statements and information relayed to me by other law enforcement officers.

5) On April 22, 2021, United States Postal Inspection Service TFO Moon identified the following inbound parcel ("the target parcel") as suspicious:

| From: | To: |
|---|---|
| William Tovar | Ashley Jones |
| 1244 E 84th Pl | 5007 Beulah Ave |
| Los Angeles, CA 90001 | Chattanooga, TN 37409 |

6) This package was addressed from a known "Source City" (Los Angeles) within a known "Source State" (California), that is, a location that tends to supply a large amount of illegal narcotics to the Eastern District of Tennessee.

7) TFO Moon reviewed historical parcels addressed to 5007 Beulah Ave Chattanooga, Tennessee 37409 and learned this address has received another prior parcel through USPS that was shipped from Los Angeles, CA. On April 16, 2021, a sender listed as "Chris Tovar" with listed address of "2010 Nadeau St Los Angeles, CA 9001" sent a parcel to "Ashley Jones" at 5007 Beulah Avenue Chattanooga, TN 37409.

8) The target parcel was found to be sent in the same transaction as another suspicious parcel identified by USPS # 9505 5152 6931 1110 4746 92 that was intercepted one day prior (April 22, 2021). That parcel was addressed to "Jim Corners" at 4318 Grand Ave Chattanooga, TN 37410. On April 22, 2021, Tennessee Highway Patrol K-9 Handler Rich

Thomas ran his drug detection K-9 "Marci" on that parcel and three others of similar size and appearance. THP Handler Thomas advised that his drug detection K-9 "Marci" demonstrated a positive alert to the odor of narcotics on the parcel addressed to 4318 Grand Ave.

9) On April 23, 2021, Tennessee Highway Patrol K-9 Handler Rich Thomas ran his drug detection K-9 "Marci" on the target parcel and three others of similar size and appearance. THP Handler Thomas advised that his drug detection K-9 "Marci" did demonstrate a positive alert to the odor of narcotics to only the target parcel addressed to 5007 Beulah Avenue.

10) A review of historical parcels going to 4318 Grand Ave Chattanooga, TN 37410 and 5007 Beulah Ave Chattanooga, TN 37409 revealed these addresses have both received similar parcels containing similar handwriting and similar, but not exact, sender information in April of 2021.

11) On April 23, 2021, the Honorable Susan K. Lee issued a search warrant for the contents of both the target parcel (1:21-mj-64) and the parcel addressed to 4318 Grand Avenue (1:21-mj-65). Upon execution of the search warrants, your affiant and TFO Moon located approximately 900 grams of, what I believe to be, counterfeit oxycodone pills inside vacuum sealed bags in the target parcel. The Grand Avenue package contained approximately 120 grams of the same type of pill in similar packaging.

12) Based on my training and experience, the size, color, and consistency of the pills are similar to other investigations that I have worked. The pills appear to be commercially manufactured opiates, but in fact, are clandestinely manufactured and contain fentanyl.

13) Your affiant conducted a law enforcement database search of the residence at 5007 Beulah Ave, Chattanooga, TN and found Monica BURTON and Jawann BURTON are both associated with the residence.

14) In February of 2021, your affiant received information from Special Agent Ayriel Novak of the Tennessee Bureau of Investigation in regards to Jawann BURTON. S/A Novak advised your affiant that she had received information from a reliable confidential source that Jawann BURTON and other known associates were involved in the distribution of counterfeit oxycodone pills that were suspected of being fentanyl.

15) During the week of April 19-23rd, TFO Lauren Moon contacted the Electric Power Board (EPB) in reference to any persons associated with accounts at 5007 Beulah Ave, Chattanooga, TN. TFO Moon was able to obtain that Monica BURTON currently has an active power account with EPB at the residence.

16) On April 26, 2021, the Honorable Christopher H. Steger, United States Magistrate Judge for the Eastern District of Tennessee issued an anticipatory search warrant for 5007 Beulah Avenue contingent on successful delivery of the target parcel.

17) On the afternoon of April 26, 2021, law enforcement officers with DEA, CPD, the Tennessee Bureau of Investigation, ATF, and United States Postal Inspection Service staged and established surveillance in anticipation of the controlled delivery of the target parcel at 5007 Beulah Avenue. At approximately 1:30 pm, United States Postal Inspection Service Task Force Officer Moon delivered the target parcel, placing it on the front porch of the residence at 5007 Beulah Avenue. The pills had been previously removed from the target parcel.

18) At approximately 1:45 pm, surveillance units observed a red Dodge Charger, with a black racing stripe and South Carolina tags pull up in the roadway in front of the residence at 5007 Beulah Avenue. The front seat passenger exited the vehicle, ran to the front porch, picked up the target parcel, and returned to the vehicle. The vehicle began to pull away from the residence, and I, your affiant, pulled my vehicle onto Beulah Avenue from West 51st Street. As I

did so, I attempted to block the vehicle from traveling. My vehicle was facing the front end of the Dodge Charger. I observed an individual, I know to be Juwann BURTON, driving the Dodge Charger. At that time, BURTON put the vehicle in reverse and accelerated backwards at a high rate of speed, he then turned around and drove north bound on Beulah Avenue at a high rate of speed. Officers did not pursue the vehicle and approached the residence at 5007 Beulah Avenue and spoke to Monica Burton, who I know to be Juwann BURTON's mother. She stated that either Juwann or Jumann Burton (Juwann's brother) picked up the package, but neither reside at that residence.

19) CPD Narcotics Detective Woody issued a BOLO ("be on the lookout") for the Red Dodge Charger. Less than five minutes later, dispatched advised Detective Woody that an anonymous caller had just reported that a Red Dodge Charger wrecked in the 5400 block of Tennessee Avenue and three black males fled on foot from the vehicle. The 5400 block of Tennessee Avenue is less than ½ a mile from 5007 Beulah Avenue.

20) Your affiant, traveled to the crash scene, and I observed a red Dodge Charger, with a black racing stripe and South Carolina tags with extensive front end damage. It appeared the vehicle had struck a telephone pole. The vehicle was unoccupied. Your affiant and other officers searched the vehicle. The target parcel was not inside the vehicle. Inside we located marijuana, a small number of pills, a backpack with scales and sandwich baggies, 3 handguns, a .300 blackout ar-style pistol, two ski masks, and Juwann BURTON's Tennessee ID. One of the handguns was tucked in between the driver's seat and center console. Below is a photo of that pistol and a photo of the other contents of the vehicle.





21) Also inside the backpack, was a Westin Hotel room key. Westin Hotel Valet

Page **10** of **13**

Case 1:21-mj-00070-CHS   Document 2   Filed 04/26/21   Page 10 of 16   PageID #: 14

tickets/receipts were located inside the vehicle.

22) TBI Special Agent Aryiel Novak traveled to the Westin Hotel located 801 Pine Street in Chattanooga, Tennessee. SA Novak spoke to employees working valet, who stated that they valeted a red Dodge Charger. SA Novak showed employees a photo of Juwann BURTON, and they confirmed they had valeted and given BURTON the vehicle earlier that afternoon. SA Novak then reviewed security cameras at the Westin Hotel. The footage shows Juwann BURTON exiting the Weston Hotel and getting into the driver's seat of the Red Dodge Charger at 1:32 pm.

23) Westin Hotel Management advised SA Novak that the valet receipts found in the wrecked Dodge Charger were charged under rooms 811 and 602. The rooms are registered to Shadericka WILLIAMS. I know WILLIAMS to be Juwann BURTON's sister. Hotel management advised that WILLIAMS checked out of room 811 today. But that the rental of room 602 was purchased through tomorrow, April 27, 2021.

24) Based on my training and experience, I believe Juwann BURTON and others yet unknown are engaging in the trafficking of controlled substances. I know that it is common for drug traffickers to utilize hotel rooms, commonly in the names of other parties, to conduct drug business and/or store controlled substances, proceeds of controlled substance sales, or items used in the furtherance of controlled substance trafficking. BURTON leaving the Westin Hotel immediately prior to his attempt to pick up the target parcel leads me to believe that evidence of drug trafficking will be found within the confines of Room 602.

25) Your Affiant believes that probable cause exists to search room 602 of the Westin Hotel located at 801 Pine Street, Chattanooga, Tennessee for: (See Attachment B)

    a) Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or

manufacture of controlled substances;

b) Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

c) Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

d) United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

e) Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, including, but not limited to: scales, baggies, packing material;

f) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

g) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

h) Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

i) Firearms;

j) Cellular telephones

_(signature)_
JUSTIN HEADDEN
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Sworn to and subscribed before me this 26Th day of April 2021.

_(signature)_
HON. CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTERS OF THE ) | |
| SEARCH OF ROOM 602 ) | No 1:21-mj- 70 |
| THE WESTIN HOTEL ) | |
| 801 PINE STREET, ) | |
| CHATTANOOGA, TN ) | |

## ATTACHMENT A

Room 602 of the Westin Hotel, 801 Pine Street Chattanooga, Tennessee

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTERS OF THE )<br>SEARCH OF ROOM 602 )<br>THE WESTIN HOTEL )<br>801 PINE STREET, )<br>CHATTANOOGA, TN ) | No 1:21-mj-70 |

## ATTACHMENT B

**Items to Be Searched for at Room 602, Westin Hotel, Chattanooga, Tennessee 37402**

a. Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

b. Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

c. Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

d. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

e. Controlled substances, material and paraphernalia for manufacturing, packaging, cutting,

Page 1 of 2

weighing and distributing controlled substances, including but not limited to: scales, baggies, packing material;

f. Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

g. The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

h. Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

i. Firearms;

j. Cellular telephones